# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 13, 2010

## STATE OF TENNESSEE v. GEORGE WASHINGTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-07696    John P. Colton, Jr., Judge**

_____

**No. W2009-01480-CCA-R3-CD  - Filed August 3, 2011**

_____

Following a jury trial, Defendant, George Washington, was convicted of aggravated vehicular homicide.  He was sentenced to serve twenty-five years in the Department of Correction.  In this appeal Defendant challenges the sufficiency of the evidence to sustain the conviction and asserts that the sentence is excessive.  Following a review of the record and the briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Charles S. Mitchell, Memphis, Tennessee, for the appellant, George Washington.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsy Paduch Stempel, Assistant Attorney General; William L. Gibbons, District Attorney General; Dennis Johnson, Assistant District Attorney General; and Brooks Yelverton, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### FACTS

Marquise Mayhorn testified that he had known the victim, Marquentis Kearney, for several years prior to the victim's death.  It so happened that at the time of the collision which killed the victim, Mr. Mayhorn was driving his 2003 Nissan Sentra southbound on North Watkins street in Memphis, in the far right lane.  The victim was driving his motorcycle southbound on North Watkins in the lane to the left of Mr. Mayhorn, about a car

length in front of Mr. Mayhorn. North Watkins has two southbound lanes, two northbound lanes, and a turn lane in the middle. Mr. Mayhorn estimated that he and the victim were both traveling about forty miles per hour, which is, or is close to, the speed limit at that location.

As Mr. Mayhorn and the victim approached the intersection of North Watkins and Claire Street, a Cadillac, being driven northbound on North Watkins, suddenly pulled into the turn lane and proceeded to turn left as if going on to Claire Street. The victim's motorcycle collided with the Cadillac vehicle in the left southbound lane of North Watkins. Defendant was driving the Cadillac.

Describing what he witnessed just prior to the collision, Mr. Mayhorn testified:

And [Defendant's vehicle] whips in[to] the [turn] lane it just went ahead on and made the turn. It didn't slow down or stop or none of that. And it, you know, [the victim] ran into the side of the Cadillac.

Just after the wreck, Defendant got out of his vehicle, walked around, and then got back into the vehicle.

Mr. Mayhorn testified that the wreck occurred about 6:30 p.m. on May 4, 2004, and that the "sun was still out." Mr. Mayhorn added that the Cadillac was about "[a] half a car length" from the oncoming motorcycle when it turned into the path of the motorcycle. As to the victim's reaction, Mr. Mayhorn stated "[The victim] hit his brakes and still couldn't stop. The car was right in front of him." Mr. Mayhorn immediately checked on the victim's physical condition, and the victim was not responding.

Memphis Police Department Lieutenant Patricia Burnett testified that she left her office on the evening of the wreck and turned southbound onto North Watkins Street. She observed a crowd gathering around the scene of the recent collision. Lt. Burnett stopped and checked the status of the motorcycle driver. She could not detect a pulse and he was unresponsive. She summoned medical assistance and for additional police department officers. Upon making initial inquiries, she spoke to Defendant. When detecting the smell of alcohol on Defendant's person, the tone of his speech, and his slow responses, she concluded that Defendant was under the influence of alcohol.

Memphis Police Department patrolman Brian Memec testified that he responded to a dispatched call for help and went to the scene of the wreck. His primary responsibility after he arrived at the scene was crowd control and to identify any witnesses. He did not observe any person other than Defendant to be near Defendant's Cadillac. Officer Memec looked inside the Cadillac and saw a bottle of vodka on the floorboard. He did not have any direct

discussions with Defendant, but was standing nearby observing Defendant while another officer talked to Defendant. Defendant appeared to have to lean against something in order to be upright, he had bloodshot, watery eyes, and had slurred speech. He concluded that Defendant was intoxicated. However, no field sobriety tests were administered because the officers had to struggle with Defendant who became combative at the rear of a squad car when he was initially handcuffed.

Memphis Police Department Sergeant William Singleton testified that he is assigned to the Special Traffic Investigation Unit ("STIS"). As a member of STIS, he received training on reconstruction of traffic accidents. He went to the scene of the wreck in this case. He took photographs and drew sketches and diagrams of the wreck scene. During his testimony on direct examination, Sergeant Singleton identified and explained several mistakes in measurements that he had initially made in the diagram of the wreck scene. On cross-examination Sergeant Singleton testified that based upon his observance of the location of gouge marks, the victim's motorcycle went down and made contact with the pavement before it struck Defendant's Cadillac.

Dr. Bruce Levy testified that he was a forensic pathologist serving as the chief medical examiner for the State of Tennessee. Dr. Levy performed the autopsy of the victim, and Dr. Levy testified that the victim had broken ribs which caused internal bleeding resulting in "significant quantities of blood within his chest." He also had other wounds and injuries on his body. Dr. Levy testified that in his expert opinion, the injuries suffered by the victim were consistent with being the result of a motorcycle wreck, and that "[b]ecause of the damage to his body from the motor vehicle collision, he bled internally, and bled a sufficient quantity of blood to cause the death."

Memphis Police Department officer Melvin Ivory responded to the scene of the wreck after receiving a dispatch, and immediately "checked for vitals" on the victim who was lying face-down on the street. He could not detect a pulse on the victim and the victim was not breathing. Officer Ivory also observed Defendant, and came to the conclusion that Defendant was intoxicated. Defendant had a strong odor of alcohol, bloodshot, watery eyes, he had to lean up against a vehicle to remain upright, his speech was slurred, and he was talkative and argumentative. When Officer Ivory attempted to place Defendant into custody, Defendant became combative by fighting and struggling with police officers. When Defendant walked, he was "[f]alling, staggering, and needed support."

Detective Carole Lewis of the Germantown Police Department testified that she was assigned to "Metro DUI" at the time of the wreck in this case. She was called to the scene of the wreck because it involved a fatality with a possibly impaired driver. After obtaining necessary information from the "STIS" lieutenant at the scene, Detective Lewis went to "the

Med" where Defendant was located in police holding. She observed a nurse withdraw a blood sample from Defendant for the purpose of testing for the presence of intoxicants. When the blood sample was properly put into the tubes for transport, the tubes were labeled and sealed in a plastic container by Detective Lewis. The blood was sent to the Tennessee Bureau of Investigation (T.B.I.) Crime Laboratory for testing. Detective Lewis identified the test results which showed that Defendant's blood had a blood alcohol content of 0.34, which was four times the "legal limit" of 0.08 blood alcohol content in Tennessee.

T.B.I. Agent Robert Marshall testified that he is a Special Agent Forensic Scientist Supervisor. He also has special training in the area of blood toxicology. He was declared as an expert witness in blood toxicology and analysis. Agent Marshall analyzed the blood sample which was taken from Defendant after the wreck. The test result of Defendant's blood alcohol content was 0.34. Agent Marshall testified that he would expect to see magnified and severe effects on a person with a blood alcohol content of more than 0.30. The person would be close to being unconscious, staggering, and unable to complete a sentence.

## ANALYSIS

### I. Sufficiency of the Evidence

Defendant asserts that the evidence was insufficient as a matter of law to sustain his conviction of the Class A felony aggravated vehicular homicide. As applicable in Defendant's case, aggravated vehicular homicide is defined as follows:

> (a) Aggravated vehicular homicide is vehicular homicide, as defined in § 39-13-213(a)(2), where:
>
> > (1) The defendant has two (2) or more prior convictions for:
> >
> > (A) Driving under the influence of an intoxicant; [or]
> >
> >                           * * *
> >
> > (3) There was, at the time of the offense, twenty-hundredths of one percent (.20%) or more, by weight of alcohol in the defendant's blood and the defendant has one (1) prior conviction for:
> >
> > (A) Driving under the influence of an intoxicant;

Tenn. Code Ann. § 39-13-218(a)(3)(A)

Tennessee Code Annotated section 39-13-213(a)(2) defines vehicular homicide, as pertinent herein,

(a)     Vehicular homicide is the reckless killing of another by the operation of an automobile, . . . as the proximate result of:

(2) The driver's intoxication, as set forth in § 55-10-401.

Tenn. Code Ann. § 39-13-213(a)(2).

As relevant herein, "[t]he driver's intoxication, as set forth in § 55-10-401" includes an alcohol concentration in a defendant's blood of 0.08 or more. Tenn. Code Ann. § 55-10-401(a)(2)(2011).

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.

Defendant's attack on the sufficiency of the evidence is essentially an argument as to the credibility of the witnesses and assertions that conflicts in the proof must be construed in favor of Defendant. Of course this argument must fail in light of the well established law set forth above.

Taken in the light most favorable to the State the evidence showed that Defendant had a blood alcohol content of 0.34 when he suddenly turned left on North Watkins Street into the path of the victim's motorcycle, causing the victim to crash into Defendant's vehicle, and this crash was the cause of the victim's death. Defendant stipulated that he had three prior convictions for DUI. This was done at the aggravated vehicular homicide bifurcated hearing before the jury following the finding of guilt as to vehicular homicide. Thus the evidence clearly proved that Defendant recklessly killed the victim by the operation of Defendant's vehicle as the proximate result of Defendant's intoxication, and that it was "aggravated" vehicular homicide by either the theory of (1) at least two prior DUI convictions *or* (2) a blood alcohol content of greater than 0.20 and one prior DUI conviction. Defendant is not entitled to relief on this issue.

## II. Sentencing

Defendant received the maximum sentence he could receive as a Range I offender for the Class A felony offense of aggravated vehicular homicide – 25 years. The offense occurred on May 4, 2004, prior to the effective date of the amendments to the Sentencing Act of 1989 which made the sentencing structure in Tennessee compliant with the Constitutional dictates of *Blakely v. Washington*, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

Defendant argues on appeal that the trial court violated his constitutional right to have only a jury apply sentencing enhancing factors other than enhancement as a result of prior criminal convictions. *See Blakely*, 124 S.Ct. at 2536. The State's only response to the Defendant's issue regarding his sentence is that Defendant has waived this issue because he failed to include the transcript of the sentencing hearing with the appellate record. Defendant makes reference to a transcript of the sentencing hearing in his brief, but the transcript is not in the record. Defendant filed a motion, which was granted, to supplement the appellate record with the transcript of the hearing on the motion for new trial. However, in spite of more than sufficient time to file a similar motion as to the transcript for the sentencing hearing, after the State's response was made known in its brief, Defendant has failed to do so.

> A party seeking appellate review has a duty to prepare a record that "conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560

(Tenn. 1993) (citing *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983)). When the record is incomplete and fails to contain a transcript of the proceedings relevant to an issue argued on appeal, or portions of the record relied on by a party, an appellate court is precluded from considering the issue. *Ballard*, 855 S.W.2d at 560-61 (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)). Moreover, in the absence of a record to review, "the appellate court must conclusively presume that the ruling of the trial judge was correct." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990).

Accordingly, the issue is waived. Nevertheless, even if not waived, we are able to discern from what *is* available in the record, that Defendant is not entitled to relief on his sentence.

Under the 2005 amendments to the 1989 Sentencing Act, a defendant whose criminal act occurs prior to June 7, 2005, the effective date of the amendments, may waive *ex post facto* protections and be sentenced under the Sentencing Act, as amended. Under both the "old" and the "new" law, the sentencing range for a Range I sentence of a Class A felony is 15 to 25 years. However, while a trial judge may not enhance a sentence under the "old" act except for the defendant's prior criminal convictions, the "presumptive" or minimum sentence for a Class A felony is 20 years, if no enhancement factors are applicable. Under the "new" act, a trial judge can *consider* all enhancement factors and is not bound to follow them to increase a sentence, but the minimum available sentence is 15 years rather than 20 years. Theoretically, then, a person in Defendant's situation would be subject to both advantages and disadvantages by being sentenced under both the "old" and the "new" law.

There is not a written waiver of *ex post facto* protections in the record, but without the transcript of the sentencing hearing we cannot be sure that no waiver was executed by Defendant.

However, the pre-sentence report is in the record, and so is the written "Sentencing Findings of Fact" signed by the trial court. The trial court applied the following statutory enhancement factors:

a)      The defendant has a previous history of criminal convictions in addition to those necessary to establish the appropriate range.

b)      The personal injuries inflicted upon or the amount of damages to property sustained by or taken from the victim was particularly great.

c)      The defendant had no hesitation about committing a crime when the risk to human life was high.

d)       The crime was committed under circumstances under which the potential for bodily injury to a victim was great.

The trial court also wrote on the sentencing findings that six prior DUI convictions "show total gross negligence and are the prime enhancing [sic] used in sentencing." Accordingly, it is clear that Defendant's prior record was given paramount weight in the trial court's decision to impose the maximum sentence of 25 years.

Enhancement factors not already elements of the offense and otherwise applicable may be applied by the trial court. At most, only two of Defendant's six prior DUI convictions were used as an element of aggravated vehicular homicide, *see* Tenn. Code Ann. § 39-13-218(a)(1) and (3). In addition to the four prior DUI convictions, the pre-sentence report shows that Defendant has the following convictions: driving while license suspended, canceled, or revoked, in 2004; improper use of automobile registration in 2004; driving while license suspended, canceled, or revoked, in 2002; reckless driving in 1999; disturbing the peace in 1986; and driving while license suspended, canceled, or revoked, in 1981.

Even if the trial court could not apply the enhancement factors other than prior convictions under the "old" law, or erroneously applied these factors under the "new" law, the nature of the prior convictions in light of the circumstances of the offense for which Defendant was sentenced in this case, justifies the imposition of the maximum sentence.

Defendant is not entitled to relief on this issue.

## CONCLUSION

After reviewing the record and the briefs of the parties, we affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, JUDGE